RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0373p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA ex rel. GURPREET MAUR, M.D.,

> *Plaintiff-Appellant*,

*v.*

ELIE HAGE-KORBAN; DELTA CLINICS, PLC, dba The Heart and Vascular Center of West Tennessee; KNOXVILLE HMA HOLDINGS, LLC, dba Tennova Healthcare; JACKSON HOSPITAL CORPORATION, dba Regional Hospital of Jackson; DYERSBURG HOSPITAL COMPANY, LLC, dba Dyersburg Regional Medical Center,

> *Defendants-Appellees*.

No. 20-5301

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 1:17-cv-01079—S. Thomas Anderson, District Judge.

Argued: October 7, 2020

Decided and Filed: December 1, 2020

Before: SILER, SUTTON, and LARSEN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Shelby Serig, MORGAN & MORGAN P.A., Jacksonville, Florida, for Appellant. Jeffrey Scott Newton, BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ, PC, Jackson, Mississippi, for Appellees Elie Hage-Korban and Delta Clinics. Brian D. Roark, BASS, BERRY & SIMS PLC, Nashville, Tennessee, for Appellees Knoxville HMA Holdings and Dyersburg Hospital Company. **ON BRIEF:** Shelby Serig, MORGAN & MORGAN P.A., Jacksonville, Florida, for Appellant. Jeffrey Scott Newton, Micahel Thomas Dawkins, Joseph Lott Warren, BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ, PC, Jackson, Mississippi, for Appellees Elie Hage-Korban and Delta Clinics. Brian D. Roark, BASS, BERRY & SIMS PLC, Nashville, Tennessee, for Appellees Knoxville HMA Holdings and Dyersburg

Hospital Company. David J. Chizewer, GOLDBERG KOHN LTD., Chicago, Illinois, for Amicus Curiae.

———————————

**OPINION**

———————————

LARSEN, Circuit Judge. In this *qui tam* action, Dr. Gurpreet Maur accuses Dr. Elie Hage-Korban ("Korban") of submitting false claims to Medicare for unnecessary cardiac testing and procedures, in alleged violation of the False Claims Act (FCA). *See* 31 U.S.C. § 3729(a)(1)(A)–(C), (G). The district court dismissed Maur's complaint pursuant to the FCA's public-disclosure bar, 31 U.S.C. § 3730(e)(4). Because we conclude Maur's allegations are "substantially the same" as those exposed in a prior *qui tam* action and Maur is not an "original source" as defined in the FCA, we AFFIRM the district court's dismissal.

I.

Dr. Korban, along with his medical practice Delta Clinics, is engaged in the private practice of diagnostic and interventional cardiology. This is not the first time he has been accused of this alleged scheme to defraud the government.

A.

In June 2007, Dr. Wood Deming filed a *qui tam* action (the "*Deming* action") under the FCA against two of the defendants in this case—Korban and Regional Hospital of Jackson ("Jackson Regional")—as well as other Tennessee hospitals where Korban performed cardiac procedures. *See United States ex rel. Deming v. Jackson-Madison Cnty. Gen. Hosp.*, No. 1:07-cv-01116-SHL-egb (W.D. Tenn. June 13, 2007). In essence, Deming charged the defendants with submitting fraudulent claims to federal government insurance programs by "ignor[ing] blatant overutilization of cardiac medical services . . . by Korban." The United States intervened in the *Deming* action and ultimately settled the case for cardiac procedures performed between 2004 and 2012.

Two of those settlements are pertinent here.  First, as a condition of his settlement, Korban entered into an Integrity Agreement (the "Korban IA") with the Office of Inspector General for the United States Department of Health and Human Services (the "Inspector General").  The Korban IA was in effect from November 13, 2013 through November 13, 2016 and was publicly available on the Inspector General's website during that time.  It required Korban to engage an Independent Review Organization to monitor "[c]oding, billing, and claims submission to all Federal health care programs by or on behalf of Korban, and reimbursement records for cardiology items."  The Korban IA further called for the Organization to conduct a review of "[c]ardiac procedures including interventional cardiac procedures . . . performed by Korban" and to "evaluate and analyze the medical necessity and appropriateness" of those procedures.  It was then to generate quarterly reports of these findings for the Inspector General, who retained ultimate supervisory authority over Korban's medical practice.  The U.S. Department of Justice issued a press release on December 19, 2013 that detailed the exposed fraudulent scheme and outlined the terms of Korban's settlement.  In the second agreement, entered into in July 2015, defendant Jackson Regional agreed to a $510,000 settlement with the Inspector General.  The Justice Department and Jackson Regional both issued press releases concerning that settlement too.

B.

Now to the present allegations.  Plaintiff-Relator Dr. Maur is a cardiologist who began working for Korban's medical practice, Delta Clinics, in 2016.  At bottom, he alleges that Korban is "simply up to his old tricks."  Specifically, his complaint lists five examples of "unnecessary angioplasty and stenting" and four examples of "unnecessary cardiology testing" performed by Korban on patients between March and November 2016.  Those allegedly unnecessary procedures were paid for in part by Medicare.

In his complaint, Maur recognizes that "this exact scheme was previously detailed and exposed in" the *Deming* action, though the named defendants differ slightly.  In addition to Korban and Jackson Regional, Maur has also sued Jackson Regional's corporate parent (Tennova Healthcare), a second Tennova subsidiary where Maur performed cardiac procedures (Dyersburg Regional Medical Center), and Tennova's corporate parent (Community Health

Systems).　He alleges these entities knew or should have known that many of Korban's procedures were medically unnecessary.

## C.

Maur filed his initial *qui tam* complaint in April 2017.　The United States declined to intervene.　The defendants then moved to dismiss, arguing that Maur's claims could not proceed because of the FCA's public-disclosure bar, 31 U.S.C. § 3730(e)(4).　The district court agreed.　It found that "[a]lthough Maur includes several new Defendants, and describes different specific patient examples, there is not only 'substantial identity' between the fraudulent scheme he alleges in his Amended Complaint and the fraudulent scheme that the *Deming qui tam* action publicly exposed—it is the same fraudulent scheme." *United States ex rel. Maur v. Hage-Korban*, No. 1:17-cv-01079-STA-jay, 2020 WL 912753, at *5 (W.D. Tenn. Feb. 25, 2020).　The district court further determined that "Maur is not an original source" as defined in the FCA. *Id.* Thus, it dismissed Maur's *qui tam* action in its entirety. *Id.*　Maur appealed.

## II.

The FCA "prohibits submitting false or fraudulent claims for payment to the United States, [31 U.S.C.] § 3729(a), and authorizes *qui tam* suits, in which private parties bring civil actions in the Government's name, § 3730(b)(1)." *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 404 (2011).　The Act encourages relators "to act as private attorneys-general in bringing suits for the common good," *United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 507 (6th Cir. 2009) (internal quotation mark omitted), and provides often-lucrative incentives to do so.　If the government proceeds with the action, the *qui tam* plaintiff is entitled to "at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim." 31 U.S.C. § 3730(d)(1).　If the government chooses not to intervene, the *qui tam* plaintiff can recover even more—"not less than 25 percent and not more than 30 percent" of the same. *Id.* § 3730(d)(2).

To guard against potential "parasitic lawsuits" and "opportunistic plaintiffs," Congress included a public-disclosure bar in the FCA. *Poteet*, 552 F.3d at 507 (citation omitted); *see* 31 U.S.C. § 3730(e)(4)(A).　That provision "bars *qui tam* actions that merely feed off prior public

disclosures of fraud." *United States ex rel. Holloway v. Heartland Hospice, Inc.*, 960 F.3d 836, 843 (6th Cir. 2020).  The bar is "wide-reaching," but it "stop[s] short of 'wiping out *qui tam* suits that rest on genuinely new and material information.'"  *Id.* at 851 (alteration adopted) (citations omitted).  As most recently amended in 2010, the FCA's public-disclosure bar directs that:

> The court shall dismiss an action or claim under [the FCA], unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
>
>> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>>
>> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>>
>> (iii) from the news media,
>
> unless the . . . person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A).

We employ a three-step analysis to decide whether this public-disclosure bar applies.  First, we ask whether, before the filing of the *qui tam* complaint, there had been any public disclosures from which fraud might be inferred.  *Holloway*, 960 F.3d at 844*.*  Second, we assess whether the allegations in the complaint are "substantially the same" as those contained in the public disclosures.  *Id.* at 849.  And third, we ask whether the *qui tam* plaintiff is nevertheless an "original source of the information."  *See id.* at 843.  Maur claims that the district court erred at all three steps.

## A.

At the first step, Maur concedes that the *Deming* action and the press releases were all publicly disclosed.  However, he contends that the Korban IA was not a public disclosure as defined in the FCA.

As an initial matter, Maur has forfeited this argument by failing to raise it below.  *See Armstrong v. City of Melvindale*, 432 F.3d 695, 700 (6th Cir. 2006).  The hospital defendants specifically argued in their motion to dismiss that the Korban IA was a public disclosure.

Yet Maur failed to contest this argument in his response.  But even if the issue were not forfeited, we would still conclude that the contents of the Korban IA qualify as a public disclosure.

The Korban IA was publicly available through the Inspector General's website from November 2013 to November 2016.  And it undoubtedly qualifies as a "Federal report" within the meaning of 31 U.S.C. § 3730(e)(4)(A).

The "sources of public disclosure in § 3730(e)(4)(A) . . . suggest that the public disclosure bar provides 'a broa[d] sweep.'"  *Schindler Elevator*, 563 U.S. at 408 (second alteration in original) (quoting *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010)).  Consistent with this "generally broad scope," the Supreme Court has interpreted "'report'" expansively to include "'something that gives information' or a 'notification.'"  *Id.* at 407–08 (quoting Webster's Third New International Dictionary 1925 (1986)); *see also* Random House Dictionary 1634 (2d ed. 1987) ("an account or statement describing in detail an event, situation, or the like").  Applying this ordinary meaning here, the Korban IA constitutes a "Federal report."  It gave information about the term and scope of the agreement, an extensive list of Korban's obligations following the settlement, and detailed requirements for engaging an Independent Review Organization that would report to the Inspector General.  By posting the Korban IA on its publicly available website, the Inspector General "release[d] the information into the public domain."  *United States ex rel. Whipple v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 782 F.3d 260, 270 (6th Cir. 2015); *accord United States ex rel. Oliver v. Philip Morris USA Inc.*, 826 F.3d 466, 476 (D.C. Cir. 2016).  Thus, the district court properly considered the Korban IA as a public disclosure.

B.

We next consider whether the publicly disclosed sources present "substantially the same allegations or transactions" as Maur's complaint.  31 U.S.C. § 3740(e)(4)(A).  We hold that they do.

"To decide whether a claim has been publicly disclosed, courts look at the essential elements of alleged fraud to determine if enough information exists in the public domain to expose the fraudulent transaction."  *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*,

874 F.3d 905, 918 (6th Cir. 2017). The key inquiry is whether the disclosures could have "put[] the government on notice of the fraud alleged in the *qui tam* complaint." *Holloway*, 960 F.3d at 851. Yet there need not be a "*complete* identity of allegations, even as to time, place, and manner" to trigger the public-disclosure bar. *Poteet*, 552 F.3d at 514 (citation omitted).[1] There need be only a "'substantial identity'" between the public disclosures and the *qui tam* complaint such that "the prior disclosures depict 'essentially the same' scheme." *Holloway*, 960 F.3d at 848 (quoting *Poteet*, 552 F.3d at 514). This is because "once the government knows the essential facts of a fraudulent scheme," it generally "has enough information to discover related frauds." *Poteet*, 552 F.3d at 516 (citation omitted); *accord Holloway*, 960 F.3d at 848, 851; *United States ex rel. Armes v. Garman*, 719 F. App'x 459, 464 (6th Cir. 2017); *United States ex rel. Antoon v. Cleveland Clinic Found.*, 788 F.3d 605, 616 (6th Cir. 2015).

1.

Maur himself states in his complaint that this "exact scheme was previously detailed and exposed in" the *Deming* action. He readily admits that his "complaint make[s] nearly identical claims" about the "same types" of fraudulent conduct. And he does not purport to offer any "unique new details or dramatic twists to the aforementioned scheme, which was previously investigated and seemingly resolved." Indeed, he copies much of the *Deming* complaint verbatim.

Maur nonetheless protests that our decision in *Ibanez* allows his case to proceed. In *Ibanez*, we stated in considered dictum[2] that "the mere resemblance of . . . allegations to a scheme resolved years earlier [was] not by itself enough to trigger the public disclosure bar." *Ibanez*, 874 F.3d at 919. Once the integrity agreements in that case had "putatively ended the scheme," we could not "assume[] that the government [was] aware" that the fraud "continue[d]

---

[1]Though *Poteet* interpreted the pre-2010 public-disclosure bar, "we have adopted principles from our pre-amendment cases that are compatible with the amended statutory text." *Holloway*, 960 F.3d at 851. The amended version of the statute expressly incorporates the "substantial identity" standard that this circuit and most other circuits had applied before 2010. *Id.* at 850.

[2]*Ibanez* went on to dismiss the claims because the relators "failed to plead a violation of the FCA with adequate particularity." 874 F.3d at 922. Thus, the discussion as to why the amended public-disclosure bar was *not* implicated in that case was neither necessary nor sufficient to support the judgment. *Wright v. Spaulding*, 939 F.3d 695, 701 (6th Cir. 2019).

(or was restarted) simply because [the government] had uncovered, and then resolved, a similar scheme before." *Id.* This was true, we hypothesized, at least "to the extent that the new allegations [were] temporally distant from the previously resolved conduct." *Id.* at 919 n.4. Maur argues that because this case, like *Ibanez*, alleges fraud occurring after the execution of an integrity agreement, the new allegations cannot be "substantially the same" as those publicly disclosed.

For their part, the defendants claim that the rigorous oversight mechanism contained in the Korban IA distinguishes this case from *Ibanez*. Because the Korban IA "requires substantial independent oversight, review, and reports to the government," *Maur*, 2020 WL 912753, at *4, the defendants contend that the government here must have had "notice of the likelihood of related fraudulent activity" by Korban, *United States ex rel. Gilligan v. Medtronic, Inc.*, 403 F.3d 386, 389 (6th Cir. 2005). In defendants' view, then, Maur's new allegations should be treated as "substantially the same" as those previously disclosed. We cannot fully embrace either party's understanding.

Both theories falter because the presence (or lack) of a robust mechanism for reporting future fraud *to the government* has no bearing on whether "substantially the same allegations or transactions" of fraud have been previously "publicly disclosed." 31 U.S.C. § 3730(e)(4)(A); *see also United States ex rel. Booker v. Pfizer, Inc.*, 9 F. Supp. 3d 34, 46 (D. Mass. 2014). Indeed, we have rejected the view that "disclosure to the government in an audit or investigation would be sufficient to trigger the bar," because then "the term 'public' would be superfluous." *Whipple*, 782 F.3d at 268. Instead, the "operative question" for deciding whether allegations are "substantially the same" is whether the *public disclosures* would themselves be "sufficient to set the government on the trail of the alleged fraud without the relator's assistance." *United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 744 (10th Cir. 2019) (alteration adopted) (internal quotation marks omitted); *see Holloway*, 960 F.3d at 848; *United States ex rel. Lager v. CSL Behring, L.L.C.*, 855 F.3d 935, 944 (8th Cir. 2017); *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 210 (1st Cir. 2016); *Oliver*, 826 F.3d at 473. If so, then regardless of what the government knows or how the government behaves, the relator's allegations are "substantially the same" as those contained in the disclosures.

That being said, we agree with defendants, and with the district court, that the character of the government's oversight arrangements can sometimes matter. And we agree with *Ibanez*, and with Maur, that post-settlement allegations of a substantially similar fraudulent scheme can sometimes serve to avoid the public-disclosure bar. *See* 874 F.3d at 919. But we think that both insights are best applied in conducting the "original source" inquiry, rather than when asking whether new allegations are "substantially the same" as those previously "publicly disclosed."

2.

Even if a *qui tam* complaint contains "substantially the same allegations or transactions" as those previously "publicly disclosed," the suit may continue if "the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A). One way a relator may qualify as an "original source" is to show that he "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions" and that he "voluntarily provided the information to the Government before filing" suit. *Id.* § 3730(e)(4)(B)([ii]).

Post-settlement allegations that a substantially similar scheme has continued or restarted could provide the government with "knowledge that is independent of and materially adds" to the public disclosures. *See Booker*, 9 F. Supp. 3d at 48. At the same time, the presence of ongoing government monitoring might detract from the conclusion that these allegations have anything material to add. But analyzing these considerations under the "original source" exception is, in our view, more consistent with the public-disclosure bar's text than the approach either party proposes. *Cf. Reed*, 923 F.3d at 757; *Winkelman*, 827 F.3d at 211. For only the original source exception—which focuses on the "material[ity]" of the new allegations—asks us to consider how a relator's allegations might actually "affect[] the government's decision-making." *United States ex rel. Advocates for Basic Legal Equal., Inc. v. U.S. Bank, N.A.*, 816 F.3d 428, 432 (6th Cir. 2016) [hereinafter *ABLE*].

The structure of the public-disclosure bar further supports this interpretation. The question whether a relator's information "materially adds" to disclosures will "often overlap[]" with "whether the relator's allegations are substantially the same as those prior revelations." *Winkelman*, 827 F.3d at 211. But "the 'materially adds' inquiry must remain conceptually

distinct; otherwise, the original source exception would be rendered nugatory." *Id.* at 211–12. If, as the defendants argue, both inquiries were to focus on what "the government may have expected" and how the integrity agreements would influence the government's actions, *Ibanez*, 874 F.3d at 919 & n.4, that would have "the effect of collapsing the materially-adds inquiry into the substantially-the-same inquiry," *Reed*, 923 F.3d at 757. We decline to accept that construction "[a]bsent clear evidence that Congress intended this surplusage." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 632 (2018); *see Davis v. Helbling*, 960 F.3d 346, 355 (6th Cir. 2020). The defendants' interpretation would leave an exception that excepts nothing.

Hence, we are left with two distinct inquiries to apply. First, Maur's allegations are "substantially the same" if there exists a "'substantial identity'" between the public disclosures and his complaint such that "the prior disclosures depict 'essentially the same' scheme." *Holloway*, 960 F.3d at 848, 851 (quoting *Poteet*, 552 F.3d at 514). For purposes of this inquiry, "[i]t is not enough" for Maur "to allege new, slightly different, or more detailed factual allegations." *Id.* at 848; *accord ABLE*, 816 F.3d at 432–33; *Armes*, 719 F. App'x at 464. Second, even if Maur has depicted essentially the same scheme, he may still clear the public-disclosure bar under the "original source" exception if he has proffered independently obtained information that "materially adds" to the public disclosures. 31 U.S.C. § 3730(e)(4)(B)([ii]); *see Holloway*, 960 F.3d at 843–44; *Reed*, 923 F.3d at 757.

3.

Turning to the first inquiry, we conclude that Maur's allegations are "substantially the same" as the public disclosures. Indeed, our caselaw demands such a result. In *Holloway*, a relator brought a *qui tam* action alleging the defendant had "orchestrat[ed] a corporate-wide scheme to submit false claims." 960 F.3d at 839. She claimed that the scheme persisted from 2004 through 2018. *See id.* at 842. However, because her "allegations [were] substantially the same as those made" in three *qui tam* actions that had been voluntarily dismissed in 2008, we held that the public-disclosure bar applied. *Id.* at 845, 851. We did so even though those previous actions from a decade earlier "were focused on a single hospice facility," as opposed to "the corporate-wide conduct alleged in [*Holloway*]." *Id.* at 849. What drove our decision was that, as in this case, the prior complaints publicly revealed that the "same . . . actor" had engaged

in "the same type of fraud" alleged. *Id.* at 847, 851. Because those "prior disclosure[s] put[] the government on notice of the fraud alleged," adding "new details to describe essentially the same scheme" was insufficient even to "survive the more lenient post-amendment public-disclosure bar." *Id.* at 850–51.

So too here. "If anything, [Maur]'s allegations add some new details to describe essentially the same scheme by [Dr. Korban]." *Id.*; *see also Bellevue v. Universal Health Servs. of Hartgrove, Inc.*, 867 F.3d 712, 720 (7th Cir. 2017) (finding allegations were "substantially similar" to public disclosures where the defendant's "conduct in subsequent years" was simply part of a "continuing practice" by the "same entity" (citation omitted)); *Oliver*, 826 F.3d at 473 (similar). Both the public disclosures and Maur's complaint were levied against the same actor for the same type of fraud. Both accuse Dr. Korban of performing unnecessary cardiac and stent procedures. Both charge him of doing so at western Tennessee hospitals owned by Tennova Healthcare. And both allege that the wrongful procedures were paid for by Medicare.

It also does not matter that Maur has added another Tennova subsidiary, its parent, and Korban's personally owned business as additional defendants. *See Holloway*, 960 F.3d at 849 (concluding that earlier allegations "focused on a single hospice facility" were sufficient to put the government "on notice of the corporate-wide conduct alleged"); *Poteet*, 552 F.3d at 511, 514 (barring claims where the "defendants involved [were] slightly different," because public disclosures "revealed the same kind of fraudulent activity"). What matters instead is that Maur has presented "substantially the same allegations" concerning a scheme perpetuated by Korban. As Maur admits, that "exact scheme" has already been publicly disclosed. The "wide-reaching public disclosure bar" therefore forecloses Maur's *qui tam* suit unless he qualifies as an "original source." *Schindler Elevator*, 563 U.S. at 408; *see* 31 U.S.C. § 3730(e)(4)(A). We now turn to that final inquiry.

## C.

The amended public-disclosure bar defines "original source" in two ways. First, it covers an individual who "prior to a public disclosure under subsection (e)(4)([A]) has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are

based."  31 U.S.C. § 3730(e)(4)(B)(i).  Second, it includes one "who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action."  *Id.* § 3730(e)(4)(B)([ii]).  Maur claims to meet both definitions.  We disagree.

1.

Maur does not fall within the first definition of an "original source" for a simple reason. He does not allege that he relayed anything to the government "prior to a public disclosure under subsection (e)(4)([A])."  *Id.* § 3730(e)(4)(B)(i).  As already explained, those disclosures include the *Deming* action, the Korban IA, and the press releases, all of which preceded Maur's complaint.

In response, Maur urges that his allegations are not "based" upon those prior public disclosures because they describe conduct occurring after that covered by the *Deming* action. Yet this is just an attempt to repackage the argument that his allegations are not "substantially the same" as the disclosures.  *Cf. Armes*, 719 F. App'x at 463 ("A later *qui tam* complaint is based upon a publicly disclosed fraud when a substantial identity exists between the publicly disclosed allegations or transactions and the *qui tam* complaint." (internal quotation marks omitted)). Because Maur did not communicate anything to the government prior to those public disclosures, he does not fit within the first definition of an "original source."[3]

2.

Nor does Maur fall within the second definition of an "original source."  He did not provide any additional, "material[]" information to the government before filing the present

—————————

[3]Maur points us to language from *Rockwell International Corporation v. United States*, 549 U.S. 457 (2007), for support.  But that case interpreted the pre-2010 version of the FCA's original source definition. *See id.* at 470–71.  This case concerns the post-2010 enactment.  And those two provisions differ in important respects.  The old version did not have any pre-public disclosure notification requirement.  *Compare* 31 U.S.C. § 3730(e)(4)(B) (1986) (defining "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information"), *with* 31 U.S.C. § 3730(e)(4)(B) (2010) (defining "original source" to include "an individual who . . . prior to a public disclosure under subsection (e)(4)([A]), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based"). *See also United States ex rel. Davis v. District of Columbia*, 679 F.3d 832, 839 n.4 (D.C. Cir. 2012) (explaining the import of the amendment).

complaint. 31 U.S.C. § 3730(e)(4)(B). "Materiality in this setting requires the claimant to show [he] had information '[o]f such a nature that knowledge of the item would affect a person's decision-making,' is 'significant,' or is 'essential.'" *ABLE*, 816 F.3d at 431 (second alteration in original) (quoting Black's Law Dictionary 1124 (10th ed. 2014)); *accord Reed*, 923 F.3d at 756; *Winkelman*, 827 F.3d at 211. In other words, the relator must bring something to the table that would add value for the government. *See Reed*, 923 F.3d at 759; *United States ex rel. Hastings v. Wells Fargo Bank, NA, Inc.*, 656 F. App'x 328, 332 (9th Cir. 2016).

Here, Maur cites nine additional patient examples, but there "is nothing significant or new" about them. *ABLE*, 816 F.3d at 431. Maur even concedes in his complaint that his allegations are "not new" and provide "no unique new details."

Yet that alone is not necessarily fatal to Maur's claim. We noted in *Ibanez* that "the mere resemblance of [the current] allegations to a scheme resolved years earlier is not by itself enough to trigger the public disclosure bar." 874 F.3d at 919. But here, Maur's allegations are neither novel nor so removed from the "resolved" conduct that we can say that he has added anything "material" to the "prior problematic [procedures] already disclosed" by the *Deming* action. *ABLE*, 816 F.3d at 431; *see Armes*, 719 F. App'x at 464.

To see why, compare this case to one like *Ibanez*. There, the defendants' scheme persisted seven years after they entered the integrity agreements, and two years after both had expired. In those circumstances, we could not "assume[] that the government [was] aware [the] fraudulent scheme continue[d] (or was restarted) simply because it had uncovered, and then resolved, a similar scheme before." *Ibanez*, 874 F.3d at 919. Bringing to light that the scheme had in fact continued well after the execution of the agreements—after they had expired even— might well have "affected the government's decision-making." *ABLE*, 816 F.3d at 432; *see Ibanez*, 874 F.3d at 919 n.4.

By contrast, Maur alleges the perpetuation of—in his words—the "exact scheme" exposed in the *Deming* action, only months after the 2015 settlement and *while* the Korban IA was still in effect. This temporal proximity to the prior settlement, combined with the ongoing effect of the Korban IA, dooms Maur's claim that he is an original source. The Korban IA

required Korban to engage an Independent Review Organization for the submission of quarterly reviews to the federal government throughout the period of Maur's allegations. The point of this oversight arrangement was to subject Korban to heightened scrutiny—to monitor whether the fraudulent scheme was continuing. With this arrangement in place, "simply asserting a longer duration for the same allegedly fraudulent practice does not materially add to the information already publicly disclosed." *Winkelman*, 827 F.3d at 212. The government was still dealing with the *Deming* allegations and scrutinizing the precise set of transactions Maur believes were fraudulent, with the benefit of an independent reviewer's assistance. And that robust review system suggests "the government may have expected" the fraud to continue even "after the agreement[ was] entered." *Ibanez*, 874 F.3d at 919 n.4.

Thus, by merely providing additional instances of the same type of fraud during the oversight period, Maur has failed to offer information of "such a nature that knowledge" of it "would affect" the "government's decision-making." *ABLE*, 816 F.3d at 431–32. After all, in these circumstances, where there is no allegation of falsification in the reports,[4] it *can* "be assumed that the government [would be] aware" if the same "fraudulent scheme continue[d] (or was restarted)." *Ibanez*, 874 F.3d at 919.

One final point bears mentioning. We agree with Maur and Amicus that "[e]ngaging in a scheme to defraud cannot immunize a fraudulent action from *qui tam* suits regarding related forms of fraud in perpetuity; what was once a hot trail of fraud must cool at some point." *Booker*, 9 F. Supp. 3d at 45; *see Ibanez*, 874 F.3d at 919. But not only did the public disclosures here "set the government on the trail of the alleged fraud without [Maur's] assistance," *Reed*, 923 F.3d at 744 (citation omitted), the government was still *in fact* on that trail. Maur does not allege that Korban did anything to throw the government off that scent. Accordingly, Maur has

---

[4]We do not speculate whether this case might have come out differently if Maur had alleged that Korban was submitting fraudulent reports or masking some transactions from review during the oversight period. Perhaps such allegations would "change [government] decisions made regarding the allegations of wrongdoing" and thereby materially add to the public disclosures. *United States ex rel. Vitale v. MiMedx Grp., Inc.*, 381 F. Supp. 3d 647, 658 (D.S.C. 2019) (citing *ABLE*, 816 F.3d at 431). But there are no such allegations here. At oral argument, Maur claimed that Korban violated his integrity agreement by failing to train Maur properly. But this "alleged breach of the[] agreement[] did not, by itself, constitute an obligation to pay the government," as such a breach only "'may' have led to obligations to pay stipulated penalties." *Ibanez*, 874 F.3d at 922; *see* R. 51-2, PageID 325–27 (providing that the Inspector General "may" "exercise its contractual right to demand payment" for certain failures by Korban "after determining that Stipulated Penalties are appropriate").

proffered no new information that materially adds to what is already contained in public disclosures.  He does not qualify as an original source.  And he cannot overcome the public-disclosure bar.

\* \* \*

For the foregoing reasons, we hold that Maur's action is foreclosed by the FCA's public-disclosure bar.  We therefore AFFIRM the district court's dismissal.