NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0174n.06

Case No. 25-5858

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and COMMONWEALTH OF KENTUCKY ex rel., MATT ANDERSON. | ) ) ) ) | |
| UNITED STATES OF AMERICA, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| Intervenor-Plaintiff, | ) ) | |
| MATT ANDERSON, | ) ) | O P I N I O N |
| Relator-Appellant, | ) ) | |
| v. | ) ) | |
| SAINT ELIZABETH MEDICAL CENTER, INC.; SUMMIT MEDICAL GROUP, INC., dba St. Elizabeth Physicians, | ) ) ) ) | |
| Defendants-Appellees. | ) | |

Before: CLAY, McKEAGUE, and NALBANDIAN, Circuit Judges.

**NALBANDIAN, Circuit Judge.** Matt Anderson believes that St. Elizabeth Medical Center, Inc., and Summit Medical Group, Inc. (together, St. Elizabeth) hoodwinked state and federal public healthcare programs by charging them for medically unnecessary kidney and vascular procedures and receiving kickbacks. So Anderson sued St. Elizabeth under the False Claims Act (FCA), 31 U.S.C. § 3729 et seq., and Kentucky's negligence per se statute, Ky. Rev. Stat. § 446.070. The district court granted St. Elizabeth's motion for judgment on the pleadings, reasoning that Anderson's FCA claim is barred because his allegations were already in the public domain and that the Kentucky law claim fails as a matter of law. We largely agree, and to the

extent we don't, we find that Anderson's claims fail for independent reasons supported by the record. So we affirm.

## I.

This is a case about doctors allegedly defrauding the government. More specifically, it's about the standards by which the law decides whether a whistleblower can sue on such allegations in the government's place.

We've got three questions to answer on that front. How much fresh information does the FCA—the federal statute empowering private individuals to bring such claims on behalf of the government—require before assigning the whistleblower the right to sue? How specific must the whistleblower's factual allegations of fraud be to pass muster under the Federal Rules of Civil Procedure? And does Kentucky law offer a device of its own to empower private plaintiffs to initiate civil suits on the government's behalf?

To answer those questions, we start by recounting the story that prompted us to ask them in the first place. That tale began more than seven years before this lawsuit, in a since-dismissed case called *United States ex rel. Kent v. St. Elizabeth Medical Center* (*Kent*), 2:17-cv-3 (E.D. Ky. Jan. 11, 2017). So we'll begin there, then move to the facts and procedural history underlying this appeal.

## A.

More than seven years before this lawsuit, James Kent (not a party here, but represented by attorneys affiliated with Anderson's counsel) filed an FCA action against St. Elizabeth, among others. Both Kent's and Anderson's versions center on allegations that St. Elizabeth fraudulently billed the public fisc for unnecessary medical services. And because the former provides nearly

2

all the factual material underlying the latter—and because, as we explain later, that's nearly dispositive of this case—we start with it.

The *Kent* complaint alleged a conspiracy to pay physicians to refer patients for medically unnecessary kidney dialysis treatments starting in 2014. Two entities allegedly hatched the plot: The Kidney and Hypertension Center, Inc. (KHC) and Davita Healthcare Partners Inc. (Davita). Davita operated six dialysis centers in Northern Kentucky under a shared-ownership arrangement with KHC. Davita retained a 51% majority interest, and KHC held the remaining equity. And because KHC's physicians "were stationed at St. Elizabeth's facilities, [the KHC physicians] caused the maximum number of patients at St. Elizabeth . . . to be referred to the [jointly-owned] dialysis center" located nearest to the St. Elizabeth facility. R.18-2, Kent Compl., PageID 125. In exchange for those automatic referrals, KHC's physicians received kickbacks to the tune of $70,000 per dialysis center per year.

Eventually, according to the *Kent* complaint, the KHC-Davita scheme expanded to include St. Elizabeth itself. KHC cut St. Elizabeth in by transferring part of its ownership interest in the dialysis centers to St. Elizabeth in exchange for St. Elizabeth automatically referring "all patients who even remotely present for kidney care" to KHC, which would in turn send the patients along for dialysis "even though the patients clearly do not medically need kidney dialysis." *Id.* at PageID 126.

In other words, St. Elizabeth and KHC worked together to gin up as many dialysis patients as possible for Davita. In exchange, they received substantial kickbacks. And unsurprisingly, that structure incentivized St. Elizabeth and KHC to refer as many patients to Davita as possible, even if dialysis was medically unnecessary.

To pay St. Elizabeth and KHC, Davita submitted claims for reimbursement to Medicare, Medicaid, and other government health care programs. Here's the rub: the statutes and regulations governing Medicare and Medicaid specify that they pay for only medically necessary services. And separately, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), makes it unlawful to offer or receive any "remuneration" in exchange for medical referrals that can be billed to a federal healthcare program like Medicare or Medicaid.

So because Kent believed that St. Elizabeth, KHC, and Davita violated (1) the Medicare and Medicaid statutes and regulations by billing the public fisc for unnecessary procedures and (2) the Anti-Kickback Statute by offering and receiving kickbacks for dialysis treatment, he sued all three players under the FCA, which empowers private civil plaintiffs to sue entities who defraud the government and share in the recovery. 31 U.S.C. § 3729; *see United States ex rel. Rahimi v. Rite Aid Corp.*, 3 F.4th 813, 822 (6th Cir. 2021). He also brought a claim under Ky. Rev. Stat. § 205.8463, a criminal statute that doesn't explicitly include a private cause of action like the FCA. Ultimately, though, Kent—himself a dialysis patient—passed away, and the administrator of his estate voluntarily dismissed the lawsuit. The Government did not intervene in the matter.

**B.**

Seven years after *Kent*, Matt Anderson came along telling largely the same story. To avoid repetition, we'll focus our description on those of Anderson's allegations that add to *Kent*.

Anderson's first addition[1] to the *Kent* allegations concerned the dialysis scheme itself. To start, he identified the leader of KHC as a physician named Dr. Shaughnessy. He also alleged that

---

[1] To be clear, Anderson concedes only that his allegations are "loosely similar" to *Kent*'s. Reply Br., p.1. He emphasizes that his allegations spell out "something materially different in time and operational detail," constituting a "later-developing architecture" of a new fraud scheme. *Id.* at p.3. But as we discuss later, the allegations at the core of Anderson's case are essentially identical

St. Elizabeth, to push its induction into the Davita-KHC scheme, "hired new nephrologists of their own"—ostensibly referring to non-KHC kidney doctors who work directly for St. Elizabeth—"and began to play 'hard ball'" with KHC (what he means by that, he doesn't say). R.1, Compl., PageID 7. And finally, Anderson added allegations about the nuts and bolts of the scheme. He described how St. Elizabeth mandates the flow of patients from its primary care physicians to the dialysis scheme through the "EPIC system," a medical referral software set up such that physicians can realistically refer only to specialists who are in on the take. *Id.* at PageID 9–10.

But it's Anderson's second set of additional allegations that keeps things fresh. A handful of paragraphs in his complaint open a new front of allegedly fraudulent billing, this time for a different type of medical service: vascular treatment. In four sentences, Anderson alleges that KHC also owns part of a "Vascular Center" where it performs additional procedures on dialysis patients, like "placing catheters" or "angioplasty of the shunt." *Id.* at PageID 8–9. So if a KHC physician deemed that a dialysis patient also needed vascular care, KHC would "automatically schedule their appointment" with the Vascular Center. *See id.* at PageID 9. That's the extent of Anderson's allegations on the vascular-care front. He doesn't offer any more detail about the nature of KHC's stake in the Vascular Center or an example of a single referral from KHC to the Vascular Center.

Summed up in his own words, Anderson's allegations depict a "later-developing architecture" than the scheme alleged in *Kent* "that allegedly used a new physician group and an integrated medical-record workflow to steer referrals, expand dialysis volume, and lock in downstream vascular access work." Reply Br., p.3.

---

to *Kent*'s allegations, so we don't have an issue framing Anderson's complaint as a superset of *Kent*.

## C.

Based on those allegations, Anderson sued St. Elizabeth under the FCA and Kentucky law. His FCA claim arose under that Act's qui tam provision, 31 U.S.C. § 3730, which allows private parties called "relators" to seek damages from entities defrauding the government. *See United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 424–25 (2023). And he pleaded his state-law claim under what he called the "Kentucky Medicare False Claims Statute," codified at Ky. Rev. Stat. § 205.8463—a provision of the state's criminal code. R.1, PageID 16.

St. Elizabeth answered and moved for judgment on the pleadings. It advanced two arguments on the FCA claim.[2] First, it contended that Anderson didn't allege sufficiently particular facts to overcome the heightened pleading standard applicable to fraud claims like those brought under the FCA. Second, St. Elizabeth invoked the FCA's public-disclosure bar to argue that Anderson couldn't sue on old news. That rule requires dismissal "if substantially the same allegations" were "publicly disclosed," including in a previous qui tam action. 31 U.S.C. § 3730(e)(4). Turning to Anderson's Kentucky-law claim, St. Elizabeth argued Ky. Rev. Stat. § 205.8463—a criminal statute—doesn't create a private cause of action, and that the claim would fail for lack of particularity in any event. The United States declined to intervene and pursue Anderson's allegations for itself.

---

[2] St. Elizabeth also argued that the FCA's qui tam mechanism is unconstitutional. The United States intervened—as is its right in qui tam lawsuits—for the limited purpose of defending the FCA's constitutionality. Rather than seek leave to reply to the United States's arguments, St. Elizabeth moved the court to stay its consideration of the constitutional arguments and focus instead on resolving the claim on non-constitutional grounds. The United States didn't object to that request, and the district court granted it, agreeing to reach the constitutional question only if the non-constitutional grounds failed to dispose of the claim. The district court's subsequent order granting St. Elizabeth judgment on the pleadings relied solely on the non-constitutional grounds, so those are the only arguments before us in this appeal.

The district court granted St. Elizabeth's motion. It compared Anderson's allegations to the *Kent* complaint and concluded that they told substantially the same story, requiring dismissal under the FCA's public-disclosure bar. It also held that Anderson couldn't invoke the original-source exception to save his FCA claim because he didn't disclose his allegations to the government before *Kent*, nor did his allegations materially add to *Kent*'s. Finally, it dismissed Anderson's Kentucky-law claim because neither Kentucky's criminal code nor its negligence per se statute create a qui-tam-like device under state law. Anderson appealed.

## II.

This appeal calls us to answer three questions. The first centers on the FCA's public-disclosure bar: Did the *Kent* complaint publicly disclose substantially the same fraud that Anderson alleges? Largely yes. The one exception—and a point of departure with the district court's reasoning—is Anderson's allegation of vascular-treatment fraud. Which leads us to the second question: Did Anderson state a claim based on the vascular-treatment allegations with sufficient particularity under the relevant pleading standard? No, so the FCA claim fails. And even though we reach that conclusion for a different reason than the district court, we can affirm its judgment for any reason supported by the record. *See South Side Quarry, LLC v. Louisville & Jefferson Cnty. Metro. Sewer Dist.*, 28 F.4th 684, 693 (6th Cir. 2022); *United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430, 435 (6th Cir. 2016). Third, and finally, does Kentucky law create a qui-tam-like cause of action to private plaintiffs purporting to sue on the state's behalf? Yet again, no, so the Kentucky-law claim also fails. We discuss each in turn, keeping in mind that the Rule 12(c) analysis—just like the familiar Rule 12(b)(6) standard—requires us to accept Anderson's allegations as true and determine whether his complaint states a

claim to relief under the applicable pleading standard. *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 611 (6th Cir. 2012).

## A.

We'll start by determining whether the public-disclosure bar disposes of Anderson's FCA claim. The district court concluded that it does, and we review the matter de novo. *Rahimi*, 3 F.4th at 823.

Congress passed the FCA during the Civil War, at a time when "the United States had been billed for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war." *Polansky*, 599 U.S. at 424 (quoting *United States v. McNinch*, 356 U.S. 595, 599 (1958)). To address the timeless and unceasing problem of grift, Congress imposed civil and criminal penalties "for many deceptive practices meant to appropriate government assets" by enacting the FCA. *See id.*; *see also* Act of Mar. 2, 1863, ch. 67, 12 Stat. 696, 698 (1863). As it reads today, the statute prohibits, among other forms of deception, conspiring to knowingly "present[] . . . a false or fraudulent claim for payment or approval" and knowingly falsify statements or records material to such claims. 31 U.S.C. § 3729(a)(1)(A)–(C).

In passing the FCA, Congress decided that the government's lawyers could use some help rooting out fraud against the public fisc. So it "encourage[s] 'whistleblowers' to act as 'private attorneys-general'" by assigning them a portion of the potential recovery in successful qui tam lawsuits. *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1041–42 (6th Cir. 1994).

But the private suitors deputized by Congress—called "relators"—must take the bitter with the sweet. *See Polansky*, 599 U.S. at 425–26. To safeguard against abuse of the qui tam device,

relators are "immediately subject to special restrictions." *Id.* at 425. One of those special restrictions is called the "public-disclosure bar," which Congress included in the FCA to prevent "parasitic lawsuits." *Rahimi*, 3 F.4th at 822 (quoting *United States ex rel. Maur v. Hage-Korban*, 981 F.3d 516, 521–22 (6th Cir. 2020)). The bar operates by requiring dismissal of qui tam claims if "substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed . . . unless . . . the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4). In other words, the rule discards claims that "merely feed off prior public disclosures of fraud." *Maur*, 981 F.3d at 522 (quoting *United States ex rel. Holloway v. Heartland Hospice, Inc.*, 960 F.3d 836, 843 (6th Cir. 2020)).

To determine whether the public-disclosure bar forecloses a qui tam claim, we apply a three-part test. First, we ask whether "there had been any public disclosures from which fraud might be inferred" before the relator filed his lawsuit. *Id.* Only if so, we move to the second question: "whether the allegations in the complaint are 'substantially the same' as those contained in the public disclosures." *Id.* (quoting *Holloway*, 960 F.3d at 849). Third, and finally, we nonetheless let the claim proceed if the plaintiff is an "original source of the information." [3] *Id.*

---

[3] Congress amended the FCA's public-disclosure bar in 2010. *See* Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119, 901–02 (2010). The amendments narrowed the public-disclosure bar's second and third prongs in two ways relevant to our purposes. First, where the pre-amendment bar foreclosed claims that were merely "based upon" prior public disclosures, the post-amendment bar targeted only those claims that are "substantially the same" as those disclosures. *Compare* 31 U.S.C. § 3730(e)(4)(A) (2010), *with id.* § 3730(e)(4)(A) (1986). And second, the amendments broadened the public-disclosure bar's original-source exception. On both fronts, the amendments made the bar "more lenient." *See Rahimi*, 3 F.4th at 826 (quoting *Holloway*, 960 F.3d at 849–51); *id.* at 831 (describing new original-source "safety valve"). We pause to note that evolution for one reason: although the public-disclosure bar is now friendlier to relators, we still follow pre-amendment caselaw if it reflects "principles . . . that are compatible with the amended statutory text," especially because we already interpreted "based upon" in the pre-amendment text to require a "substantial identity" between the relator's allegations and the prior public disclosure. *See Holloway*, 960 F.3d at 850–51 (citation modified).

(citation modified). And again, because we're reviewing the district court's grant of a motion for judgment on the pleadings, we accept Anderson's allegations as true and view the facts in the light most favorable to him throughout our analysis.

The district court ruled against Anderson on all three parts of the test. But Anderson only disputes the district court's holdings on the second and third prongs. So we focus our attention there.[4] Applying those two prongs, we conclude that Anderson is precluded by the public-disclosure bar from bringing an FCA claim on any of his allegations save those concerning the Vascular Center. We'll consider the two prongs in turn.

**1.**

Since there's no dispute that the *Kent* complaint constitutes a public disclosure of fraud, we'll move straight to determining whether Anderson's allegations are "substantially the same" as those disclosed by *Kent*. *See* 31 U.S.C. § 3730(e)(4)(A). The answer is yes as to Anderson's dialysis allegations, but no as to his vascular-treatment allegations.

The "key inquiry" to determine whether a relator's allegations are "substantially the same" as a prior public disclosure is "whether the disclosures could have put the government on notice of the fraud alleged in the qui tam complaint." *Maur*, 981 F.3d at 523 (citation modified). That standard is met (and the qui tam claim is barred) when the relator's allegations merely "add some new details to describe essentially the same scheme by the same corporate actor as the publicly

---

[4] For what it's worth, we'd agree with the district court's finding that the *Kent* complaint constitutes a public disclosure of dialysis fraud even if Anderson disputed it. All that's required on that front is for the prior disclosure to "put the government on notice of the possibility of fraud surrounding the product or transaction." *United States ex rel. Gilligan v. Medtronic, Inc.*, 403 F.3d 386, 390 (6th Cir. 2005) (citation modified). That said, we'd be hard-pressed to hold that *Kent* put the government on notice of fraud related to the Vascular Center. But we have no occasion to weigh in one way or the other because the first prong (whether *Kent* counts as a prior public disclosure of fraud) isn't before us in the first place.

disclosed fraud" or "add a level of detail to knowledge that was already in the public domain." *Rahimi*, 3 F.4th at 826 (citation modified). That means that "there need not be a '*complete* identity of allegations, even as to time, place, and manner' to trigger the public-disclosure bar." *Maur*, 981 F.3d at 523 (quoting *United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 514 (6th Cir. 2009)). If the prior public disclosure and the qui tam complaint "depict 'essentially the same' scheme," the bar is triggered. *Id.* (quoting *Holloway*, 960 F.3d at 848).

All of Anderson's dialysis-fraud allegations are barred by their previous disclosure in the *Kent* complaint. As explained above, and as Anderson seems to acknowledge in his briefing, most of his allegations describe the same fraudulent scheme spelled out in *Kent*. By his own description, he added some new brushstrokes to *Kent*'s picture: (1) that he discovered a "new nephrology group, headed by Dr. Shaughnessy"; (2) that the group "steered patients" to Davita using a computer system called "EPIC to facilitate those referrals and billing"; and (3) that the conspirators billed unnamed "commercial insurers" in addition to public payors. Appellant Br., pp.12, 16. We'll take them one by one.

First up: Anderson's alleged discovery of a "new nephrology group," *id.*, is anything but. His complaint alleges that "Dr. Shaughnessy is the head of the Kidney and Hypertension Group." R.1, PageID 8. Elsewhere, it explains that "St. Elizabeth, Davita[,] and Kidney and Hypertension (all three players) . . . formed a new group" with the "new nephrologists" hired by St. Elizabeth. *Id.* at PageID 7. Taking those two statements as true, and drawing all reasonable inferences in Anderson's favor, we read Anderson to mean that Dr. Shaughnessy heads KHC—the same KHC involved in the scheme alleged by *Kent*. To be sure, Anderson added one detail: Dr. Shaughnessy's name. But we've held that it "does not matter that [the relator] has added another" entity as an "additional defendant[]" (or, in this case, as a mysterious figure mentioned once).

11

*Maur*, 981 F.3d at 526. Instead, what mattered "is that [the relator] has presented substantially the same allegations concerning a scheme perpetuated" by the previously named fraudsters. *Id.* (citation modified). The same goes here. The scheme alleged here is no different from *Kent*'s just because Anderson pleaded one new name in one paragraph of his complaint, especially when the new name isn't a new co-conspirator, but one of the existing co-conspirator's personnel.

Anderson's second purportedly new fact—that St. Elizabeth used the EPIC computer system to force physicians to refer dialysis patients only to Davita—"merely adds details to what is already known in outline." *Rahimi*, 3 F.4th at 831 (quoting *United States ex rel. Advocs. for Basic Legal Equal., Inc. v. U.S. Bank, N.A.* (*ABLE*), 816 F.3d 428, 432 (6th Cir. 2016)). The *Kent* complaint alleged that "St. Elizabeth automatically refers" all kidney-care patients "either by having its staff make the referral or by requiring its affiliated primary care physicians to do so." R.18-2, PageID 126. Anderson just names the specific computer software used for the referrals. Again, that allegation does not transform the alleged fraud into one about which the government lacked notice from the *Kent* complaint.

Third, and finally, comes Anderson's allegation that he alleged "a distinct or expanded scheme" from *Kent*'s by pleading that the co-conspirators billed "commercial insurers" in addition to public payors. Appellant Br., p.12. The problem here is that fraud on non-governmental entities is outside the FCA's ken. So it would make little sense to defang the FCA's public disclosure bar whenever a relator adds factual allegations on which FCA recovery is impossible as a matter of law. Allowing relators' claims to go through just because they're pleaded alongside such allegations would incentivize "opportunistic plaintiffs" to adorn "parasitic lawsuits" with useless facts, undermining the public-disclosure bar's aim of weeding out such suits. *See Maur*, 981 F.3d at 521–22.

The vascular-treatment allegations, on the other hand, present a different story. As a reminder, Anderson alleged that KHC also owns equity in a "Vascular Center" to which it automatically directs any dialysis patient who "need[s] a catheter changed or needs angioplasty of the shunt." R.1, PageID 8–9. *Kent* didn't allege anything of the sort. So unlike the more detailed dialysis-fraud allegations we just canvassed, we can't say that *Kent* "put the government on notice of the fraud" described by Anderson's vascular-treatment allegations. *Maur*, 981 F.3d at 523 (citation modified). Thus, the public-disclosure bar doesn't apply to those allegations.

At day's end, "it is not enough" for Anderson "to allege new, slightly different, or more detailed factual allegations" about the dialysis fraud already described in *Kent*. *Maur*, 981 F.3d at 525. But even those kinds of allegations can sometimes proceed through the original-source exception, which we turn to next.

**2.**

Now we consider if the public-disclosure bar's "original source" exception saves Anderson's dialysis-fraud allegations. *See* 31 U.S.C. § 3730(e)(4)(A). Because these additional allegations don't "materially add[] to the publicly disclosed allegations," we hold that it doesn't. *Id.* § 3730(e)(4)(B).

The public-disclosure bar exempts claims if "the person bringing the action is an original source of the information." *Id.* § 3730(e)(4)(A). The statute defines an "original source" in two ways. First, an individual can be an original source if they've "voluntarily disclosed to the Government the information" on which their claim is based "prior to a public disclosure" of those allegations. *Id.* § 3730(e)(4)(B)(i). The second variety covers those who have "knowledge that . . . materially adds to the publicly disclosed allegations" and "voluntarily provided the

information to the Government before filing an action under this section." *Id.* § 3730(e)(4)(B)(2). Anderson offers no argument on the first definition, so we focus on the second.

Anderson doesn't pass muster under either requirement to be an original source under that definition: that his allegations "materially add[] to the publicly disclosed allegations" and that he "voluntarily provided the information to the Government" before suing. *Id.*

First, it appears that Anderson never voluntarily provided his allegations to the government before filing suit. So far as we can tell, nothing in the record shows that Anderson told the government what he thought St. Elizabeth was up to before suing. And Anderson hasn't cited anything to show otherwise. For that reason alone, he shouldn't be able to avail himself of the original-source exception.

But even if Anderson did disclose his allegations to the government before suing, he'd falter on the second prong: materiality. Insubstantial additions to previously disclosed allegations can still be material—and therefore qualify for the original-source exception—if "knowledge of the [allegation] would affect [the government's] decision-making." *ABLE*, 816 F.3d at 431 (citation modified). That means that "the relator must bring something to the table that would add value for the government" and "change [its] thinking or decision-making with respect to the alleged fraud." *Rahimi*, 3 F.4th at 831–32 (citation modified).

None of the details Anderson added to *Kent* are "material" such that they'd move the needle for the government. *See* 31 U.S.C. § 3730(e)(4)(B)(2). Anderson doesn't offer much argument on this front other than to say that his additional details could influence the government because they "identify who currently profits from the alleged scheme, how referrals are structured in light of ownership interests, what role EPIC plays, and which payors are affected." Appellant Br., pp. 16–17. But the government already knew those details from *Kent*. It knew that St. Elizabeth,

Davita, and KHC would profit from the alleged scheme. It knew that referrals run from St. Elizabeth's primary care physicians to KHC nephrologists, and finally to the Davita clinics. It knew that state payors are affected and, as we discussed earlier, it's not relevant under the FCA that private payors were affected. The only bona fide additions to *Kent* are the naming of Dr. Shaughnessy and EPIC. But we struggle to see how those additional allegations would change the government's appetite to prosecute. After all, those are the sorts of nitty-gritty details about the alleged fraud that the government could discover for itself while investigating the scheme. And if the government wasn't even interested in the scheme's broad contours, it's hard to see how its mind would change based on easily uncoverable details.

One feature of Anderson's allegations bears further examination, though. We've recognized that allegations of previously disclosed fraud *can* be material if the scheme is sufficiently temporally "removed from . . . 'resolved' conduct." *See Maur*, 981 F.3d at 528 (quoting *ABLE*, 816 F.3d at 431). In other words, the original-source exception offers a safety valve to certain allegations of renewed fraud: schemes exposed by an earlier disclosure and resolved under the government's eye, but restarted after the government's oversight ends. *See id.* In those instances, renewed allegations can be material because the government might not have been "aware [that] the fraudulent scheme continued (or was restarted) simply because it had uncovered, and then resolved, a similar scheme before." *Id.* (citation modified) (quoting *United States ex rel. Ibanez v. Brystol-Myers Squibb Co.*, 874 F.3d 905, 919 (6th Cir. 2017)). Anderson's reliance on that carveout is misplaced. We've only recognized that rationale in cases in which the government already pursued and resolved the fraud exposed by the previous public disclosures. In those scenarios, the government would probably find it valuable to know that the fraud it stymied before—and therefore wouldn't expect to recur—is back again. That doesn't fit these

facts. The government didn't intervene or take any other action in *Kent*, so there's no reason to believe that renewed allegations of the same type of fraud would be valuable to the government now merely because of a gap of seven years between the lawsuits.

**B.**

That brings us to the Vascular Center allegations. Those don't fall under the public-disclosure bar's scope thanks to their novelty, but they're not home free. Anderson's allegations on that front face an independent hurdle: Federal Rule of Civil Procedure 9(b)'s heightened pleading requirement.

Rule 9(b) requires a party "alleging fraud" to "state with particularity the circumstances constituting fraud." FCA claims are subject to that heightened pleading standard. *United States ex rel. Laughlin v. Radiation Therapy Servs., P.S.C.*, 148 F.4th 791, 798–99 (6th Cir. 2025). And in the FCA context specifically, that standard requires a relator to "identify a representative false claim that was actually submitted to the government" or "include[] allegations showing specific personal knowledge supporting a strong inference that a false claim was submitted." *Ibanez*, 874 F.3d at 914 (citation modified).

Anderson doesn't plead the Vascular Center allegations with sufficient particularity under that standard. His complaint doesn't contain a single representative false claim. And he offers no allegations supporting a "strong inference" that he has "specific personal knowledge" to back up his claim. *See id.* All that he's got is four sentences, the sum of which communicates only that KHC has a "Vascular Center," they "own 49%" of it, and they "automatically schedule their [patients'] appointment[s]" with the Center. R.1, PageID 8–9. Not a single representative claim, and not a single allegation supporting personal knowledge.

For that reason, Anderson's Vascular Center allegations can't carry his FCA claim, either.

16

**C.**

Finally, we reach Anderson's Kentucky law claim. He blends two state statutes to argue that Kentucky law includes an implicit FCA-like qui tam device that allows relators to pursue recovery for medical fraud on the state's behalf. But Kentucky's legislature didn't go nearly so far. So we agree with the district court and affirm its dismissal of Anderson's Kentucky law claim.

Anderson's state-law theory blends two statutes. The first, Kentucky's negligence per se statute, Ky. Rev. Stat. § 446.070, provides a cause of action to "person[s] injured by the violation of any statute." The second, a provision of Kentucky's criminal code, penalizes various forms of fraud in the provision of healthcare services. *Id.* § 205.8463. It authorizes the state attorney general to prosecute violations on the state's behalf, *id.* § 205.8469, and makes violators liable for restitution and civil payments to be paid into the state's Medicaid trust fund, *id.* § 205.8467. So Anderson argues that he can sue in the state's place because the criminal provision counts as "any statute" under the negligence per se private cause of action. *See id.* § 446.070.

But Anderson's theory stumbles on Kentucky courts' interpretation of the negligence per se statute. As the Kentucky Supreme Court explained, § 446.070 "creates a private right of action under which a damaged party may sue for a violation of a statutory standard of care, provided that three prerequisites are met." *Hickey v. Gen. Elec. Co.*, 539 S.W.3d 19, 23–24 (Ky. 2018) (quoting *Vanhook v. Somerset Health Facilities, LP*, 67 F. Supp. 3d 810, 819 (E.D. Ky. 2014)). First, the statute on which the claim is based "must be penal in nature or provide no inclusive civil remedy." *Id.* Second, the plaintiff must be "within the class of persons the statute is intended to protect." *Id.* And third, the "plaintiff's injury must be of the type that the statute was designed to prevent." *Id.*

17

Anderson fails on the negligence per se statute's second requirement. The Kentucky criminal code provision on which Anderson bases his claim doesn't protect whistleblowers. It protects the state's medical assistance programs from fraudulent claims. *See* Ky. Rev. Stat. § 205.8463. And even if we strained to say that the statute *also* protects those programs' beneficiaries—like patients receiving healthcare or healthcare providers receiving payments— Anderson is neither.

For that reason alone—and because the briefing on the issue is relatively sparse—we needn't examine the negligence per se statute's other two requirements. Anderson's failure to show that he falls within the class of people protected by § 205.8463 suffices to preclude his claim as a matter of law.

## D.

Anderson presents one counterargument throughout his briefing: that rather than dismiss his claims with prejudice, the district court should've afforded him leave to amend. But he never asked the district court for such relief, forfeiting the argument here. *See Song v. City of Elyria*, 985 F.2d 840, 842–43 (6th Cir. 1993) (argument to remand for leave to amend "without merit because the plaintiffs failed to move the district court for leave to amend"); *Siler v. Webber*, 443 F. App'x 50, 58 (6th Cir. 2011) (citing *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 522 (6th Cir. 2008)). We won't do his work for him by requiring the district court to consider a discretionary remedy that Anderson didn't request.

## III.

For those reasons, we affirm.

18